COCA-COLA FOODSERVICE
BEVERAGE MARKETING AGREEMENT
El Pollo Regio Franchising, LLC
June 8, 2012

**EXHIBIT B**

## SCOPE OF MARKETING AGREEMENT

The parties to the Beverage Marketing Agreement (the "**Agreement**") are El Pollo Regio Franchising, LLC ("**Franchisor**" or "**Customer**") and Coca-Cola FoodService ("**CCF**"), part of The Coca-Cola Company ("**Company**"). The Agreement will apply to all outlets where Beverages are served that are owned or operated by Franchisor or any of its subsidiaries or its authorized franchisees ("**Franchisees**"), or have the same ownership group as Franchisor, including (a) any outlets that are opened after the Agreement is signed, (b) any outlets that are co-branded, and (c) any outlets acquired during the Term of the Agreement, unless those outlets are already governed by an agreement with CCF and that agreement is validly assigned to Franchisor as part of the acquisition. If the acquired outlets are currently under a pre-existing agreement with a Competitive Beverage supplier, the acquired outlets will come under this Agreement after the competitive agreement is terminated or expires. The Agreement will not apply to any outlets outside the fifty United States and the District of Columbia.

All outlets owned or operated by Franchisor are referred to as "**Corporate Outlets.**" Outlets owned by Franchisees are referred to as "**Franchised Outlets.**" Franchised Outlets and Corporate Outlets are together referred to as "**System**" or "**System Outlets.**" The programs described in this Agreement are the only programs in which the System Outlets may participate during the Term. Franchisor agrees to notify CCF in writing whenever Franchisor authorizes a new Franchisee.

## FRANCHISED OUTLETS

Franchisor will (i) designate CCF's Fountain Beverages and Company's Bottle/Can Beverages as the only Fountain Beverages and Bottle/Can Beverages approved by Franchisor for use in any outlets owned by Franchisees, (ii) mandate Company as the approved Beverage supplier for Franchisees; (iii) use its best efforts, subject to applicable law, to recommend to its Franchisees to serve in their outlets a brand set consisting only of CCF's Fountain Beverages, and (iv) take no action inconsistent with the marketing programs described in this Agreement. In addition, Franchisor will not authorize for sale in the Franchised Outlets any Beverages in bottles, cans or other packaging that are not marketed under a trademark owned by or licensed to Company. In consideration of these commitments by Franchisor, CCF agrees to provide to Franchisees who enter into a written participation agreement with CCF ("**Participating Franchisees**") the marketing, equipment and service programs set forth in that participation agreement. Outlets owned by Participating Franchisees are referred to as "**Participating Franchised Outlets.**" The Corporate Outlets and the Participating Franchised Outlets are collectively referred to as the "**Participating System Outlets**" or the "**Participating System.**"

Franchisor represents and warrants that the terms of its franchisee agreement or another agreement it has executed with its Franchisees authorize Franchisor to collect from suppliers marketing or promotional allowances made available in connection with the purchase of such suppliers' products by Franchisees (the "**Authorization**"). Franchisor represents and warrants that the terms of the Authorization authorize Franchisor, among other things: (i) to establish those products and materials to be used in the System; (ii) to require that each Franchisee sell or offer for sale only those products, foods, Beverages and other menu items that have been expressly approved by Franchisor; and (iii) to designate and approve marketing and advertising programs for the Participating System. Franchisor further represents and warrants that all of its Franchisees have executed such Authorization and that the Authorization is in effect and enforceable at the time of this Agreement. Should the Authorization terminate as to one or more Franchisees, or the applicable provisions become unenforceable during the Term, Franchisor agrees to provide prompt written notice of same. Franchisor agrees that all funding it receives on behalf of the Participating System will be utilized by Franchisor for the benefit of the Participating System, including specifically Participating Franchisees, and to increase the sale of CCF's Fountain Beverages throughout the Participating System. Franchisor agrees to provide all Participating Franchisees with written notification of the funding being paid on their behalf and the purpose for which it is used. Franchisor agrees to defend, indemnify and hold harmless CCF from any and all claims or

Franchisor initials _____

Classified - Confidential

other costs and liabilities arising out of CCF's payment of funding to Franchisor, or out of Franchisor's failure to provide required disclosures to Franchisees.

**TERM**

The Agreement will become effective when signed by both parties and the Term shall begin as of the first day of the month in which it is signed by Franchisor. The Term will continue for a period of five (5) years or until the Participating System Outlets have purchased the Volume Commitment, whichever occurs last. When used in this Agreement, the term "**Year**" means each consecutive twelve-month period during the Term, beginning with the first day of the Term, and any remaining period of time between the last full twelve-month period and the end of the Term.

**ENTIRE AGREEMENT**

This Agreement also consists of the following:

- **Exhibits "A-1" through "A-2"** Program Terms and Conditions
- **Exhibit "B"** Definitions
- **Exhibit "C"** Standard Terms and Conditions
- **Exhibit "D"** Coca-Cola Equipment Lease Agreement

As of the beginning of the Term, this Agreement will supersede all prior agreements between the parties relating to the subject matter of this Agreement. No supplement, modification, or amendment of this Agreement shall be binding unless executed in writing by authorized representatives of both parties.

**THIS AGREEMENT SHALL NOT BE EFFECTIVE UNTIL SIGNED BY FRANCHISOR AND AN AUTHORIZED REPRESENTATIVE OF CCF.**

Accepted and agreed to this 26 day of June, 2012

Accepted and agreed to this 8 day of June, 2012

COCA-COLA FOODSERVICE

EL POLLO REGIO FRANCHISING, LLC

By: _____
(signature)
James L. Remsen
Vice President of Sales, Central Zone - South

#298877

By: _____
(signature)
Juan J. Bazaldua
Managing Member and President
3030 LBJ Freeway, Suite 1440
Dallas, TX 75234

ACN: _____

Franchisor Initials _____

## EXHIBIT "A-1"

## FOUNTAIN PROGRAM TERMS AND CONDITIONS

1. **VOLUME COMMITMENT**

   The Participating System will purchase a minimum of 197,650 gallons of CCF's Fountain Syrups, including CCF's Tea Syrups, during the Term (the "**Volume Commitment**"). This Term Volume Commitment will be increased by CCF if Franchisor or the Participating Franchisees acquire additional outlets to which the Agreement will apply.

   **National Chain Account Price**

   CCF agrees that during the Term, Franchisor and each Participating Franchisee will have the right to purchase Fountain Syrups from CCF at CCF's then-current published chain account prices, which prices are subject to change from time to time.

   **Franchisor's Closed Commissaries**

   During the Term, Franchisor shall be entitled to participate in CCF's Alternate Route To Market ("**ARTM**") Program. This Program is subject to change from time to time, and Franchisor shall be subject to the terms and conditions generally applicable under this Program. Franchisor must operate one or more distribution facilities that meet CCF's qualifications and that sell CCF's Fountain Syrups, pursuant to CCF's then-current ARTM distributor appointment, to Participating System Outlets.

2. **BEVERAGE AVAILABILITY/NO COMPETITIVE ADVERTISING**

   Each Participating System Outlet will serve a core brand set of Fountain Beverages that consists of Coca-Cola®, Diet Coke®, Sprite® and, on equipment with eight (8) valves or more, COKE Zero$^{TM}$, and the remaining products will be jointly selected by Franchisor and CCF.

   Franchisor may elect one of the following options upon signing this Agreement and must maintain that one option for the duration of the Term:

   Option 1: _SK_ All Fountain Beverages served in the Participating System Outlets will be CCF's brands.

   **OR**

   Option 2: ____ All Fountain Beverages served in the Participating System Outlets will be CCF's brands, except, subject to the Fair Share section, each Participating System Outlet may serve one competitive Fountain Beverage brand, and that competitive Fountain Beverage may be served on only one valve per dispenser per outlet (a "**Permitted Exception**"); provided, however, that in no event may a Participating System Outlet serve a non-CCF cola product or any Product of PepsiCo. If the Permitted Exception is later acquired by PepsiCo, that brand may no longer be served in the Participating System Outlets and will no longer be deemed a "Permitted Exception."

   Furthermore, all Tea Beverages served in the Participating System Outlets will be Company's Teas.

   In addition, the Participating System Outlets may not dedicate any valve on a Fountain Beverage dispenser leased from CCF to dispense tap water.

   Since the sale of Competitive Beverages in bottles, cans or other packaging would diminish the product availability rights given to CCF, the Participating System Outlets also will not serve Competitive Beverages whether in bottles, cans, cups or other packaging.

Franchisor initials _SK_          Classified - Confidential

### NO COMPETITIVE ADVERTISING

No Competitive Beverages will be depicted, advertised, promoted, or merchandised anywhere in or in association with the Participating System Outlets.

3. **MARKETING PROGRAM**

In consideration of the Beverage Availability rights granted to CCF above, the marketing programs outlined below will be provided to assist the Participating System in maximizing the sale of CCF's Fountain Beverages, including Tea Beverages, in the Participating System Outlets. Franchisor agrees that CCF will have the right to audit compliance with the performance criteria outlined herein at all reasonable times and places.

Unless otherwise mutually agreed in writing, the programs set forth in this Agreement do not apply to Fountain Syrups used to prepare frozen Beverages, and purchases of such syrups shall not count toward the Volume Commitment.

#### Business Development Fund

CCF will provide one-time funding in the amount of ▓▓▓▓ to be advanced within thirty days of when the Agreement is signed by both parties to offset costs associated with the following performance criteria:

- Implement point of sale advertising featuring 2-liter bottles of Company Bottle/Can Beverages.
- Maintain consistent merchandising of a combo-meal program featuring CCF's Fountain Beverages.
- Perform those additional Fountain Beverage business-building activities the parties mutually agree upon.

Funding is provided in return for Franchisor's commitment to serve and to cause its Franchisees to serve CCF's Fountain Beverages in the Participating System Outlets throughout the Term, and will be earned at the rate of $0.06 per gallon over the Term.

#### Marketing Support Funds

Funding is earned at the rate of ▓▓▓▓ for each gallon of CCF's Fountain Syrups the Participating System Outlets purchase. To qualify for funding, each Participating System Outlet must comply with all of the following performance criteria and all other obligations under this Agreement:

- Implement and maintain a Fountain Beverage cup set consisting of no smaller than 20 oz. and 32 oz. sizes.
- Prominently display approved renditions of Company's trademarked vessels on all drive-thru and dine-in menu boards, including combo meals.
- Implement a combo-meal program featuring CCF's Fountain Beverages.
- Include approved renditions of Company's brands, trademarks and/or logos on merchandise at point of order (e.g., counter card, register topper, counter mats, lobby stands).
- Include approved renditions of Company's brands, trademarks and/or logos on the following: merchandised coolers, register topper, wall poster in beverage center, 3 cup set, door merchandising, window merchandising, wall poster in the back of the house.
- Implement a permanent free refill program featuring CCF's Fountain Beverages.
- Perform those additional Fountain Beverage marketing activities the parties mutually agree upon.

Franchisor initials 

Classified - Confidential

Funding will be paid quarterly to Franchisor on behalf of the Participating System, following the period in which it is earned.

### Promotional Support Fund

Funding is earned at the rate of ▇▇▇ for each gallon of CCF's Fountain Syrups the Participating System Outlets purchase. To qualify for funding, each Participating System Outlet must comply with all of the following performance criteria and all other obligations under this Agreement:

- Prominently display approved renditions of Company's trademarked vessels on all drive-thru and dine-in menu boards, including combo meals.
- Implement a combo-meal program featuring CCF's Fountain Beverages.
- Include approved renditions of Company's brands, trademarks and/or logos on merchandise at point of order (e.g., counter card, register topper, counter mats, lobby stands).
- Perform those additional Fountain Beverage marketing activities the parties mutually agree upon.

Funding will be managed by CCF and used to pay Franchisor or its suppliers for goods and services needed to fulfill the performance criteria and will be reconciled annually. If the expenses for fulfilling the performance criteria are less than the funding available under the Promotional Support Funds, the excess funding will be used by CCF to support additional Fountain Beverage marketing activities.

### 100% CCF Brand Fund

Funding is earned at the rate of ▇▇▇ for each gallon of CCF's Fountain Syrups that the Participating System Outlets purchase. Funding will be paid quarterly to Franchisor on behalf of the Participating System, following the period in which it is earned. In order to maintain this funding, all Participating System Outlets must only serve CCF products for the duration of the Term.

4. **EQUIPMENT PROGRAM**

Where permitted by law, CCF will lease to Franchisor and to each Participating Franchisee without charge during the Term for each Participating System Outlet an equipment package consisting of the following (or its equivalent): (i) one 8-valve dispensing unit; (ii) one 8-valve ice combo dispensing unit; (iii) two variety Tea towers or "Space Savers" (for drive-thru windows); and any ancillary equipment reasonably necessary to enable Franchisor and Participating Franchisees to dispense a quality Fountain Beverage. No ice makers or water filters will be provided.

In any state where a lease without charge is not permitted (e.g., Wisconsin) or Franchisor or Participating Franchisees elect to lease additional dispensing equipment, such equipment will be leased to Franchisor and Participating Franchisees at an annual lease rate calculated by multiplying the total installed cost of the additional equipment by the then-current lease factor. The lease factor currently in effect for equipment is .24. Should the lease factor change during the Term, any equipment installed after the change goes into effect will be subject to the new lease factor. Lease charges, if any, will be deducted from earned funding. Charges in excess of earned funding will be invoiced. All equipment provided by CCF will at all times remain the property of CCF and is subject to the terms and conditions of CCF's standard lease agreement (the "**Lease**"). The Lease terms are attached as **Exhibit "D"** and are a part of the Agreement, except as specifically changed by the Program Terms and Conditions or Standard Terms and Conditions. Franchisor will cause its Participating Franchisees to comply with and be bound by the terms and conditions set forth in **Exhibit "D"**.

Franchisor initials _____      Classified - Confidential

5. **SERVICE PROGRAM**

Franchisor and Participating Franchisees may use CCF's Service Network without charge for up to four (4) regular mechanical repair calls for Fountain Beverage and Tea Beverage dispensing equipment per Year for each Participating System Outlet. These calls are calculated sequentially on a per outlet basis and may not be aggregated. Parts required for these regular mechanical repair calls will also be provided without charge. Any removal, remodel, relocation or reinstallation of dispensing equipment, installation or removal of ice makers, service caused by ice, flavor changes, summerize/winterize, line changes, or service necessitated by damage or adjustments to the equipment resulting from misuse, abuse, failure to follow operating instructions or service by unauthorized personnel, unnecessary calls (equipment was not plugged in, CO2 or Fountain Syrup container was empty), or calls that are not the result of mechanical failure (collectively "**Special Service Calls**"), are not considered regular service and will not be provided free of charge. Charges for Special Service Calls or for regular mechanical repair calls in excess of those available without charge under this program will be charged at CCF's then current rate, and will be deducted from earned funding. Charges will include labor, travel time, parts, and administrative costs. Charges in excess of earned funding will be invoiced.

Franchisor initials _____

Classified - Confidential

<u>EXHIBIT "A-2"</u>
PROGRAM TERMS AND CONDITIONS

1. <u>VOLUME COMMITMENT</u>

   The Participating System Outlets will purchase a minimum of 50,375 physical cases of Company Bottle/Can Beverages during the Term. This Term Volume Commitment will be increased by CCF if Franchisor or the Participating Franchisees acquire additional outlets to which the Agreement will apply.

2. <u>PERFORMANCE CRITERIA</u>

   The Participating System Outlets will adhere to the following performance criteria in all Participating System Outlets:

   a. Company Bottle/Can Beverages will be the only Bottle/Can Beverages sold or made available at each Participating System Outlet through authorized distributors with special authorization from Company ("**Authorized Distributor**"). Currently, Franchisor is or will be an Authorized Distributor and will distribute Company Bottle/Can Beverages to the Participating System Outlets.

   b. The Participating System will participate in a minimum of two (2) mutually agreed upon promotional activities each Year to promote the sale of Company Bottle/Can Beverages at the Participating System Outlets. Franchisor agrees not to unreasonably withhold its consent to promotional activities proposed by CCF.

   c. No permanent or temporary advertising, signage or trademark visibility for any Beverages other than Company Beverages will be displayed or permitted anywhere at the Participating System Outlets, and Franchisor will not enter into any agreement or relationship whereby any Beverages other than Company Beverages are associated in any manner with Franchisor, the Participating System, or any of the trademarks of Franchisor, in any advertising or promotional activity of any kind.

   d. Franchisor shall authorize and assist in the placement of at least one (1) Company-owned Cold Carton Merchandiser for the exclusive display of Company Bottle/Can Beverages in each Participating System Outlet to be placed in mutually agreed to high traffic locations.

3. <u>COLD DRINK EQUIPMENT</u>

   During the Term, Company will provide each Participating System Outlet with the equipment identified in Section 2.d above (hereinafter the "**Cold Drink Equipment**") at no cost to Franchisor and each Participating Franchisee, except as prohibited by law, rule or regulation, in which case the rent charged shall be the lowest legal rate available from Company. All Cold Drink Equipment will be identified by Company Bottle/Can Beverage trademarks and will remain the property of the Company. Except where prohibited by law, all Cold Drink Equipment shall exclusively dispense Company Bottle/Can Beverages and no Beverages other than Company Bottle/Can Beverages may be stored, displayed or sold in, on or through the Cold Drink Equipment. Use of the Cold Drink Equipment shall be in accordance with the Company's standard equipment placement terms, and Franchisor agrees to abide and to cause its Franchisees to abide by such terms. To the extent that such standard placement terms are inconsistent with the terms of this Agreement, the terms of this Agreement shall control. Company shall have the right to relocate or remove some or all of the Cold Drink Equipment if Company determines the volume of Company Bottle/Can Beverages sold through such equipment justifies relocation or removal. Installation, service, electrical hook-up and utilities for the Cold Drink Equipment will be at the Participating System Outlet's expense. Franchisor represents and warrants that electric service at the Participating System Outlets is proper and

Franchisor initials ___*7*___    Classified – Confidential

adequate for the installation of the Cold Drink Equipment, and Franchisor agrees to indemnify and hold harmless Company from any damages arising out of defective electrical services.

4. **PRICING**

As of the beginning of the Term and throughout the rest of the Term, the prices for Company Bottle/Can Beverages will be Company's then current national alternative route to market prices ("**ARTM Prices**"), which prices are subject to change from time to time. ARTM Prices are quoted "FOB plant" and therefore do not include distributor mark-up, freight and delivery fees, or platform upcharges that may be a component of freight. In addition, ARTM Prices are exclusive of taxes and government mandated deposits and required handling fees. Furthermore, ARTM Prices do not apply to Participating System Outlets in Hawaii and Alaska. Current pricing for the Company Bottle/Can Beverages is identified in the table below.

| Company Bottle/Can Beverage | Effective Date for Pricing:- 1/1/12 | Case Allowances |
|---|---|---|
| 20 oz. CSD (24 count) | [redacted] | [redacted] |
| 2L Bottles (24 count) | [redacted] | [redacted] |
| 20 oz. POWERade® (24 count) | [redacted] | [redacted] |
| 16 oz. (or 16.9 oz.) vitaminwater® (24 count) | [redacted] | [redacted] |
| 450 ml. Minute Maid® Juice-to-Go (24 count) | [redacted] | [redacted] |

ARTM Prices quoted above are exclusive of taxes and government mandated deposits and required handling fees. All prices quoted above are based on the case configuration noted above; however, some of the products may be sold in different case configurations. No matter how the product is sold to the customer, it is translated to the case configuration noted above for purposes of calculating funding and for purposes of sales and financial reporting. For example: a product that is 12 bottles to a case in case configuration noted above that is sold to the customer in a 6 count case, the on-invoice 6 bottle case price would have to be divided by 6 and multiplied by 12 in order to determine if prices exceed the prices above.

5. **MARKETING PROGRAM**

In consideration of the Beverage Availability rights granted to above, the marketing program outlined below will be provided to assist Franchisor in maximizing the sale of Company Bottle/Can Beverages in the Participating System Outlets.

**Marketing Support Funds**

Franchisor will earn Marketing Support Funding on behalf of the Participating System at the per standard physical case of Company Bottle/Can Beverages specified above in the Pricing section,

Franchisor initials _____

Classified - Confidential

which are purchased by the Participating System Outlets from the supplying bottler for sale at the Participating System Outlets. CCF will pay all earned funding to Franchisor semi-annually on behalf of the Participating System, following the period in which it is earned. Franchisor agrees to accept the case sales records of the supplying bottler for purposes of determining Marketing Support Funding earned hereunder. To qualify for funding, Franchisor and the Participating System Outlets agree to abide by all Performance Criteria described in Section 2. above.

Franchisor initials _____

Classified - Confidential

4

## EXHIBIT "B"

## DEFINITIONS

Certain capitalized words or phrases are used throughout this document. Such words or phrases have the following meanings:

1. "**Beverage**" means all soft drinks and other non-alcoholic beverages.

2. "**Bottle/Can Beverages**" mean all Beverages, including pre-mix Beverages, in pre-packaged, ready-to-drink form in bottles, cans or other factory-sealed containers.

3. "**Company Bottle/Can Beverages**" means all Bottle/Can Beverages that are marketed under trademarks owned or controlled or licensed for use to Company and purchased by Franchisor and its Franchisees directly from the supplying bottler for sale at the Participating System Outlets.

4. "**Competitive Beverages**" mean all Beverages that are not Company Beverages, and any products, whether or not Beverages, marketed under Beverage trademarks that are not Company Marks (e.g., "Gatorade Energy Bars").

5. "**Fountain Beverages**" are those Beverages that are dispensed from post-mix or pre-mix (but not frozen) beverage dispensers, bubblers, or similar equipment.

6. "**Fountain Syrup**" means the Fountain Beverage syrup used to prepare Fountain Beverages, but does not include other forms of concentrate, such as frozen concentrates used to prepare juices, or Liquid Coffee Concentrate.

7. "**Product of PepsiCo**" is any Beverage which has a trademark owned, licensed to or controlled by PepsiCo, its subsidiaries or affiliates, or any entity or joint venture in which PepsiCo has at least a 50% ownership interest.

8. "**Tea**" means the post-mix tea, tea leaves or tea powder used to make Tea Beverages.

9. "**Tea Beverages**" means iced and hot teas that are freshly brewed or dispensed from post-mix, pre-mix Tea brewers, dispensers, bubblers, or similar equipment.

10. "**Tea Syrups**" means Teas in bag-in-box ("BIB") form that is dispensed from post-mix dispensers.

11. "**The Coca-Cola Company**" means The Coca-Cola Company and its wholly owned subsidiaries.

Franchisor initials _____    Classified - Confidential

EXHIBIT "C"

STANDARD TERMS AND CONDITIONS

1. **TERMINATION AND DAMAGES**

Once both parties sign the Agreement, it may be terminated before the scheduled expiration date only in the following circumstances: (i) Either party may terminate the Agreement if the other party fails to comply with a material term or condition of the Agreement and does not remedy the failure within ninety (90) days after receiving written notice specifying the non-compliance; or (ii) CCF may terminate the Agreement if, at any time during the Term or over the course of the Term, there is a transfer or closing of a substantial number (30% or higher) of the Participating System Outlets or a transfer of a substantial portion of the assets of Franchisor that is not in the ordinary course of business.

Upon expiration or termination, Franchisor must return any dispensing equipment owned by CCF and the marketing program will no longer be made available to Franchisor. In addition, if any piece of equipment is removed from an outlet prior to 100 months from the installation date for that piece of equipment, Franchisor will pay CCF the actual cost of removal (including standard shipping and handling charges) and remanufacturing of the Equipment, as well as the unamortized portion of the costs of (i) installation and (ii) non-serialized parts (e.g., pumps, racks and regulators) and other ancillary equipment. Collectively, removal costs and items (i) and (ii) are referred to as "unbundling costs." Upon termination, Franchisor must also pay the following amounts: (a) All paid but unearned funding; plus (b) Interest at the rate of 1%, compounded monthly, or such lesser percentage as required by law, accrued from the date funds were paid or unbundling costs were incurred through the date of repayment.

The parties acknowledge that in addition to the liquidated damages outlined above, either party may pursue other remedies or damages if the other party breaches the terms of the Agreement. Nothing herein shall be construed as a waiver of any right of CCF to prove consequential damages as a result of a breach by Franchisor including, but not limited to, lost profits, and other damages allowable.

2. **NON-COMPLYING OUTLETS**

If any Participating System Outlet fails to comply with this Agreement, Franchisor will forfeit all funding earned by such Participating System Outlet for the period of non-compliance. In the event the Participating System Outlet has not achieved compliance within thirty (30) days from receipt of written notice of non-compliance from CCF, all funding attributable to such Participating System Outlet for the then-current Year will be forfeited, and CCF will have the option to terminate this program with respect to such Participating System Outlet on thirty (30) days' additional written notice. In the event ten percent (10%) or more of the Participating System Outlets fail to comply with this Agreement, CCF shall have the right to terminate this Agreement for breach, and the termination remedies set forth above shall apply. Nothing in this paragraph shall operate to restrict any of CCF's other remedies in the event of a material breach by Franchisor.

3. **GOVERNING LAW/ DISPUTE RESOLUTION**

This Agreement shall at all times be governed by the laws of the State of Georgia. Should there be a dispute between CCF and Franchisor relating in any way to the Agreement, the breach of the Agreement, or the business relationship of the parties, the parties agree that they will make a good faith effort to settle the dispute in an amicable manner. If the parties are unable to settle the dispute through direct discussions, at that time they will attempt to settle the dispute by mediation administered by the American Arbitration Association (the "AAA") as a condition precedent to either party's resort to litigation or other formal, binding means of dispute resolution. The prevailing party shall be entitled to recover its reasonable attorneys' fees and other costs and expenses of litigation or other formal means of dispute resolution. If litigation is pursued, the exclusive venue for such litigation shall be in the federal or state courts located in Atlanta, GA, and the parties agree to submit to the personal jurisdiction of the courts in the State of Georgia.

4. **TRANSFERS AND ASSIGNMENTS**

If there is a transfer of a substantial number (30% or higher) of the Participating System Outlets, or a transfer of a substantial portion of the assets of Franchisor that is not in the ordinary course of business, and CCF does not elect to terminate the Agreement under the "Termination" section above, then, at CCF's election, Franchisor shall cause the acquiring, surviving or newly created business to assume all of Franchisor's obligations under the Agreement with regard to the acquired assets or business. The Agreement shall not be otherwise assignable without the express written consent of CCF. Nothing contained herein shall be construed as a waiver of CCF's termination rights pursuant to this Agreement.

If Franchisor transfers or closes any Participating System Outlets, Franchisor shall pay CCF the unbundling costs (as defined in the "Termination" section above) on equipment in such Participating System Outlet installed less than 100 months prior to the transfer or closure, unless Franchisor causes the new owner or operator at the location to assume the lease of the equipment on terms acceptable to CCF in its reasonable discretion.

5. **TRADEMARKS**

Neither Franchisor nor CCF shall make use of Company's or Franchisor's trademarks or logos (either alone or in conjunction with their or another party's trademarks or logos) without the prior written consent of that party, and all use of the other party's trademarks shall inure to the benefit of trademark owner. For purposes of this Agreement, Company's trademarks include trademarks owned, licensed to or controlled by an entity in which Company has a fifty percent (50%) or more ownership interest.

6. **CONFIDENTIALITY**

Neither party shall disclose to any third party without the prior written consent of the other party, any information concerning this Agreement or the transactions contemplated hereby, except for disclosure (1) to any attorneys, accountants and consultants involved in assisting with the negotiation and closing of the contemplated transactions, or (2) to affiliates of CCF including Company's Bottlers, or (3) to Franchisees, or (4) as required by law. A party that makes a permitted disclosure must obtain assurances from the party to whom disclosure is made that such party will keep confidential the information disclosed.

7. **OFFSET**

If Franchisor owes any amounts to CCF under this or any other agreement, in addition to any other remedies it may have, CCF may use funds due Franchisor to offset amounts due to CCF under this or any other agreement. Excess lease charges, service costs and fair share charges, if any, will be deducted from earned funding.

8. **FORCE MAJEURE**

Either party is excused from performance under this Agreement if such nonperformance results from any act of God, strikes, war, terrorism, riots, acts of governmental authorities, shortage of raw materials or any other cause outside the reasonable control of the nonperforming party.

9. **WAIVER**

The failure of either party to seek redress for the breach of, or to insist upon the strict performance of any term, clause or provision of the Agreement, shall not constitute a waiver, unless the waiver is in writing and signed by the party waiving performance.

10. **WARRANTIES**

Franchisor and CCF each represent and warrant that they have the unrestricted right to enter into this Agreement and to make the commitments contained in this Agreement. In addition, each party represents that the person whose signature appears on the Agreement has the right to execute this Agreement on behalf of the party indicated. Franchisor represents and warrants that it complies with and will cause its Franchisees to comply with all applicable laws and regulations and all appropriate practices with respect to food safety including the storing, preparation and serving of food and potability of water. Furthermore, Franchisor acknowledges and agrees to comply and to cause its Franchisees to comply with all equipment manufacturers' specifications and product dispensing and preparation instructions and specifications. Finally, Franchisor agrees to comply and will cause its Franchisees to comply with CCF's Quality Beverage standards.

11. **RESALE AND PACKAGING**

Franchisor agrees to properly dispose of CCF's Fountain Syrup bag-in-box packaging and will cause its Franchisees to do the same. Franchisor also agrees not to resell and to cause its Franchisees not to resell CCF Fountain Syrup or any other Beverage component or ingredient purchased from CCF to third parties or resell Syrup packaging to third parties except for purposes of environmentally safe disposal. Lastly, Franchisor agrees to sell and to cause its Franchisees to sell the finished Fountain Beverage only in cups or glasses and not in closed containers that retain carbonation, or in bottles or cans.

12. **CONSTRUCTION/ SEVERABILITY**

This Agreement and any accompanying documents constitute negotiated agreements between the parties, and the fact that one party or its counsel, or the other, shall have drafted this Agreement, any document or particular provision hereof shall not be considered in the construction or interpretation of this Agreement, the documents or any provision hereof. If any term or provision of this Agreement is found to be void or contrary to law, such term or provision will be deemed severable, but only to the extent necessary to bring this Agreement within the requirements of law, from the other terms and provisions hereof, and the remainder of this Agreement will be given effect as if the parties had not included the severed term herein.

Franchisor initials: _____

1. **LEASE AGREEMENT AND TERM.** Coca-Cola FoodService ("CCF") hereby leases to the account identified on the attached Beverage Marketing Agreement ("Lessee") all fountain beverage dispensing equipment provided to Lessee (the "Equipment"), subject to the terms and conditions set forth in this Lease Agreement. Unless otherwise agreed in writing, the Equipment shall also include, where applicable, all permanent merchandising, menu boards, refrigeration units, ice makers and water filtration equipment installed by CCF on Lessee's premises. Each piece of Equipment is leased commencing on its installation date (the "Commencement Date"). Lessee may request the removal of any Equipment upon thirty (30) days prior written notice to CCF. Removal of Equipment will not affect the term of any other agreement between the parties, such as the Beverage Marketing Agreement. If this Lease is terminated with respect to any piece of Equipment for any reason prior to 100 months from the Commencement Date for that piece of Equipment, Lessee will pay CCF the actual cost of removal (including standard shipping and handling charges) and remanufacturing of that Equipment, as well as the unamortized portion of the costs of (i) installation, (ii) non-serialized parts (e.g., pumps, racks and regulators) and other ancillary equipment. Collectively, removal costs and items (i) and (ii) are referred to as "unbundling costs." The terms of this Lease will continue in effect with respect to each piece of Equipment until the Equipment has been removed from Lessee's premises and will survive the expiration or termination of the Beverage Marketing Agreement.

2. **RENT FOR THE EQUIPMENT.** All equipment leased to Lessee will be leased at an annual rate calculated by multiplying the total installed cost of equipment by the then-current lease factor, plus all applicable sales and use taxes, if any, as rent for the Equipment. Rent will be due monthly. At CCF's discretion, CCF may utilize funds due Lessee to offset amounts due CCF under this Agreement. If Lessee fails to pay, within 10 days of its due date, rent or any other amount required by this Lease to be paid to CCF, Lessee shall pay to CCF a late charge equal to five percent (5%) per month of such overdue payment, or such lesser amount that CCF is entitled to receive under any applicable law.

3. **TITLE TO THE EQUIPMENT.** Title to the Equipment is, and will at all times remain, vested in CCF. Lessee will have no right, title, or interest in or to the Equipment, except the right to quiet use of the Equipment in the ordinary course of its business as provided in this Lease. Lessee shall execute such title documents, financing statements, fixture filings, certificates and such other instruments and documents as CCF shall reasonably request to ensure to CCF's satisfaction the protection of CCF's title to the Equipment and CCF's interests and benefits under this Lease. Lessee shall not transfer, pledge, lease, sell, hypothecate, mortgage, assign or in any other way encumber or dispose of any of the Equipment. THE PARTIES AGREE, AND LESSEE WARRANTS, THAT THE EQUIPMENT IS, AND WILL AT ALL TIMES REMAIN, PERSONAL PROPERTY OF CCF NOTWITHSTANDING THAT THE EQUIPMENT OR ANY PART THEREOF MAY NOW BE, OR HEREAFTER BECOME, IN ANY MANNER AFFIXED OR ATTACHED TO, OR EMBEDDED IN, OR PERMANENTLY RESTING UPON, REAL PROPERTY OR IMPROVEMENTS ON REAL PROPERTY. Lessee may perform ordinary maintenance and repairs to the Equipment as required by this Lease, but shall not make any alterations, additions, or improvements to the Equipment without the prior written consent of CCF. All parts added to the Equipment through alterations, repairs, additions or improvements will constitute accessions to, and will be considered an item of the Equipment and title to such will immediately vest in CCF. Lessee agrees that CCF may transfer or assign all or any part of CCF's right, title and interest in or to any Equipment (in whole or in part) and this Lease, and any amounts due or to become due, to any third party ("Assignee") for any reason. Upon receipt of written notice from CCF of such assignment, Lessee shall perform all its obligations with respect to any such Equipment for the benefit of the applicable Assignee, and, if so directed, shall pay all amounts due or to become due hereunder directly to the applicable Assignee or to any other party designated by such Assignee.

4. **USE OF EQUIPMENT.** Lessee acknowledges that the rent does not fully compensate CCF for its expenses concerning its research and development efforts designed to improve fountain equipment or in providing the Equipment to Lessee, and that CCF provides the Equipment to Lessee for the purpose of dispensing CCF products. Therefore, Lessee agrees that if the Equipment is a fountain beverage dispenser, then the Equipment will be used for the purpose of dispensing fountain beverage products of CCF, such as Coca-Cola® classic (or Coke®), diet Coke® and Sprite®. If the Equipment is a pump for bag-in-box or similar container, such pump may be used only to dispense CCF products. If the Equipment is other than a fountain beverage dispenser or a pump, then it will be used only in a location where fountain beverage products of CCF are served and where no fountain beverage products of PepsiCo, Inc. or an affiliate of PepsiCo, Inc. are served. This Section 4 shall not apply within the State of Wisconsin.

5. **INSPECTION AND NOTIFICATION.** CCF shall have the right during Lessee's regular business hours to inspect the Equipment at Lessee's premises or wherever the Equipment may be located and to review all records that relate to the Equipment. Lessee shall promptly notify CCF of all details arising out of any change in location of the Equipment, any alleged encumbrances thereon or any accident allegedly resulting from the use or operation thereof.

6. **WARRANTY DISCLAIMER·** LESSEE ACKNOWLEDGES THAT CCF IS NOT A MANUFACTURER OF THE EQUIPMENT AND THAT CCF HAS MADE NO REPRESENTATIONS OF ANY NATURE WHATSOEVER PERTAINING TO THE EQUIPMENT OR ITS PERFORMANCE, WHETHER EXPRESS OR IMPLIED, INCLUDING (WITHOUT LIMITATION) ANY IMPLIED WARRANTIES OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE, OR ANY OTHER WARRANTIES RELATING TO THE DESIGN, CONDITION, QUALITY, CAPACITY, MATERIAL OR WORKMANSHIP OF THE EQUIPMENT OR ITS PERFORMANCE, OR ANY WARRANTY AGAINST INTERFERENCE OR INFRINGEMENT, OR ANY WARRANTY WITH RESPECT TO PATENT RIGHTS, IF ANY, PERTAINING TO THE EQUIPMENT. CCF SHALL NOT BE RESPONSIBLE FOR ANY LOSS OF PROFITS, ANY DIRECT, INCIDENTAL OR CONSEQUENTIAL LOSSES, OR DAMAGES OF ANY NATURE WHATSOEVER, RESULTING FROM THE DELIVERY, INSTALLATION, MAINTENANCE, OPERATIONS, SERVICE OR USE OF ANY EQUIPMENT OR OTHERWISE.

7. **TAXES.** Lessee shall pay all assessments, license fees, taxes (including sales, use, excise, personal property, ad valorem, stamp, documentary and other taxes) and all other governmental charges, fees, fines or penalties whatsoever, whether payable by CCF or Lessee, on or relating to the Equipment or the use, registration, rental, shipment, transportation, delivery, or operation thereof, and on or relating to this Lease.

8. **MAINTENANCE AND REPAIRS.** Lessee shall, at its expense, keep the Equipment in good condition, repair, and working order. Lessee shall pay all costs incurred in connection with the shipment, use, operation, ownership, or possession of the Equipment during the term of this Lease. Lessee's sole recourse against CCF with respect to service provided by CCF or its agents to the Equipment is that CCF will correct any defective workmanship at no additional charge to Lessee, provided that CCF is given prompt notification of any defective workmanship. CCF shall not be otherwise liable for negligent acts or omissions committed in regard to maintenance or repair of the Equipment and assumes no responsibility for incidental, consequential or special damages occasioned by such negligent acts or omissions.

9. **RISK OF LOSS.** All risk of loss, including damage, theft or destruction, to each item of Equipment will be borne by Lessee. No such loss, damage, theft or destruction of Equipment, in whole or in part, will impair the obligations of Lessee under this Lease, all of which will continue in full force and effect.

10. **INDEMNITY.** Lessee shall indemnify CCF and Company and each of their officers, agents, employees, directors, shareholders, affiliates, successors, and assigns (hereinafter the "Indemnified Parties") against, and hold Indemnified Parties wholly harmless from, any and all claims, actions, suits, proceedings, demands, damages, and liabilities of whatever nature, and all costs and expenses, including without limitation Indemnified Parties' reasonable attorneys' fees and expenses, relating to or in any way arising out of (a) the ordering, delivery, rejection, installation, purchase, leasing, maintenance, possession, use, operation, control or disposition of the Equipment or any portion thereof; (b) any act or omission of Lessee, including but not limited to any loss or damage to or sustained by the Indemnified Parties arising out of Lessee's failure to comply with all the terms and conditions of this Lease; (c) any claims for liability in tort with respect to the Equipment, excepting only to the degree such claims are the result of the Indemnified Parties' negligent or willful acts. The provisions of this Section 10 will survive termination and expiration of this Lease.

11. **DEFAULT.** The occurrence of any of the following will constitute a "Default" by Lessee: (a) nonpayment by Lessee when due of any amount due and payable under this Lease; (b) failure of Lessee to comply with any provision of this Lease, and failure of Lessee to remedy, cure, or remove such failure within ten (10) days after receipt of written notice thereof from CCF; (c) any statement, representation, or warranty of Lessee to CCF, at any time, that is untrue as of the date made; (d) Lessee's becoming insolvent or unable to pay its debts as they mature, or Lessee making an assignment for the benefit of creditors, or any proceeding, whether voluntary or involuntary, being instituted by or against Lessee alleging that Lessee is insolvent or unable to pay its debts as they mature; (e) appointment of a receiver, liquidator, trustee, custodian or other similar official for any of the Equipment or for any property in which Lessee has an interest; (f) seizure of any of the Equipment; (g) default by Lessee under the terms of any note, document, agreement or instrument evidencing an obligation of Lessee to CCF or to any affiliate of CCF, whether now existing or hereafter arising; (h) Lessee taking any action with respect to the liquidation, dissolution, winding up or otherwise discontinuing the conduct of its business; (i) Lessee transferring all or substantially all of its assets to a third party; or (j) the transfer, conveyance, assignment or pledge of a controlling interest or ownership of Lessee to a third party without CCF's prior written consent.

12. **OPTION TO ACCELERATE AT WILL.** If at any time CCF in good faith believes that the prospect for Lessee's payment or other performance under this Lease is impaired, CCF may demand immediate payment of all rents due and scheduled to come due during the remainder of the Lease term. All future rent accelerated under this or any other provision of this Agreement will be discounted to present value, which will be computed at a discount rate of five (5) percent. Failure of Lessee to make full payment within thirty (30) days of its receipt of the demand for accelerated rent will constitute a "Default" by Lessee as defined in Section 11.

13. **REMEDIES.** Upon the occurrence of any Default or at any time thereafter, CCF may terminate this Lease as to any or all items of Equipment, may enter Lessee's premises and retake possession of the Equipment at Lessee's expense, and will have all other remedies at law or in equity for breach of the Lease. Lessee acknowledges that in the event of a breach of Sections 4 or 5 or a failure or refusal of Lessee to relinquish possession of the Equipment in breach of this section following termination or Default, CCF's damages would be difficult or impossible to ascertain, and Lessee therefore agrees that CCF will have the right to an injunction in any court of competent jurisdiction restraining said breach and granting CCF the right to immediate possession of the Equipment.

14. **LIQUIDATED DAMAGES.** If Lessee acts in violation of the prohibitions described in Section 3 of this Agreement, or is unable or unwilling to return the Equipment to CCF in good working order, normal usage wear and tear excepted, at the expiration or termination of the Lease, Lessee shall pay as liquidated damages the total of: (i) the amount of past-due lease payments, discounted accelerated future lease payments, and the value of CCF's residual interest in the Equipment, plus (ii) all tax indemnities associated with the Equipment to which CCF would have been entitled if Lessee had fully performed this Lease, plus (iii) costs, interest, and attorneys' fees incurred by CCF due to Lessee's violation of Section 3 or its failure to return the Equipment to CCF, minus (iv) any proceeds or offset from the release or sale of the Equipment by CCF.

15. **OTHER TERMS.** Lessee represents and warrants that it complies with all applicable laws and regulations and all appropriate practices with respect to food safety including the storing, preparation and serving of food. Furthermore, Lessee acknowledges and agrees to comply with all equipment manufactures specifications and product dispensing and preparation instructions and specifications. No failure by CCF to exercise and no delay in exercising any of CCF's rights hereunder will operate as a waiver thereof; nor shall any single or partial exercise of any right hereunder preclude any other or further exercise thereof or of any other rights. This Lease constitutes the entire agreement of the parties and supersedes all prior oral and written agreements between the parties governing the subject matter of this Lease; provided, however, that if CCF and Lessee have entered into a Marketing Agreement into which this Lease is incorporated, to the extent that any of the terms in this Lease conflict with the terms set forth in the Marketing Agreement, the terms of the Marketing Agreement will control. No agreement will be effective to amend this Lease unless such agreement is in writing and signed by the party to be charged thereby. Any notices permitted or required by this Lease will be in writing and mailed by certified mail or hand delivered, addressed to the respective addresses of the parties. All claims, actions or suits arising out of the Lease shall be litigated in courts in either the State of Georgia or in the state of Lessee's principal place of business. Each party hereby consents to the jurisdiction of any local, state or federal court located within the State of Georgia and/or the state of Lessee's principal place of business, and designates the Secretary of State of the State as its agent for service of process. THIS LEASE WILL BE GOVERNED BY THE LAWS OF THE STATE OF GEORGIA. Time is of the essence to each and all of the provisions of this Lease.

Franchisor initials: _____

Classified - Confidential